FILED

08/26/2019

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2019

## IN RE JAYDA S.

**Appeal from the Circuit Court for Hamilton County**
**No. 18A186   Ward Jeffrey Hollingsworth, Judge**

_____

## No. E2019-00395-COA-R3-PT

_____

Mother appeals the trial court's order terminating her parental rights. Concluding that the record contains clear and convincing evidence to support the trial court's findings of a ground for termination and that termination is in the child's best interest, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and ANDY D. BENNETT, JJ., joined.

Emily Brenyas, Chattanooga, Tennessee, for the appellant, Denisha S.

Herbert H. Slatery, III, Attorney General and Reporter;  Amber L. Seymour, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

### BACKGROUND

Appellant Denisha S. ("Mother") gave birth to a child, Jayda S. ("Jayda" or "the child"), in April 2017 in Chattanooga.[1] Jayda is Mother's sixth child, none of whom are in Mother's physical custody.[2] Jayda's putative father was killed by Mother during a

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

[2] Three of Mother's children are in the temporary custody of the children's maternal great-aunt, who was also Mother's adoptive mother. One child lives with the Mother's pastor, while another child lives with a family friend. When not incarcerated, Mother and other witnesses said that she worked to maintain relationships with her children.

domestic violence incident on December 14, 2016. Mother was deemed to have acted in self-defense and not criminally charged following the putative father's death.

When giving birth to Jayda four months later, Mother tested positive for cocaine while at Erlanger Health Systems. In a previous hearing during Mother's pregnancy, Mother stated that she used cocaine multiple times throughout her pregnancy as a way to cope with the death of the child's father. Mother tested positive for cocaine in three drug screens between September 2016 and March 2017. On April 17, 2017, the Tennessee Department of Children's Services ("DCS") received a referral regarding the positive drug test and a potentially drug-exposed child. While the child did not test positive for drugs, DCS filed a petition for temporary legal custody and an ex parte order regarding the child. Jayda was removed from Mother's custody and placed into foster care on April 20, 2017. After Mother waived her preliminary and adjudicatory hearings, the child was deemed dependent and neglected by a Hamilton County Juvenile Court magistrate in May 2017 because of Mother's cocaine use during and after her pregnancy.

A permanency plan was developed with the goal of returning the child to Mother's care. That permanency plan required Mother to: (1) complete a mental health assessment and follow its recommendations, (2) complete an alcohol and drug assessment and follow its recommendations, (3) submit to drug screens to demonstrate being drug-free, (4) maintain stable housing, (5) maintain employment, (6) pay child support, and (7) participate in parenting classes and follow recommendations of a parenting assessment. Mother signed the permanency plan later ratified by the Hamilton County Juvenile Court on July 12, 2017. DCS further advised Mother about the circumstances that could lead to termination of her parental rights.

Mother was repeatedly incarcerated during her pregnancy and after the child was born. While pregnant, Mother was jailed from March 24 to March 27, 2017. Mother was later arrested on two counts of theft and charges of criminal conspiracy and fabricating evidence. She pleaded guilty to both theft charges, while the remaining charges were dismissed. Mother was incarcerated at the Hamilton County Jail on June 17, 2017 and subsequently transferred to the Silverdale Detention Center. She remained at Silverdale Detention Center until November 29, 2017, when she was transferred into the custody of Catoosa County, Georgia officials on separate criminal charges. Mother was released from custody on February 1, 2018 and referred to the Hamilton County Mental Health Court, but was incarcerated again on March 12, 2018 after failing a drug screen. She was released on April 10, 2018, nine days before the petition to terminate parental rights was filed against her. Following a separate probation violation, Mother was taken into custody again on May 14, 2018, where she remained when the trial on the termination petition occurred. At the time of the trial, Mother was expected to be released in November 2018,

though it was unclear whether she would be transferred into Catoosa County, Georgia to complete a separate sentence.[3]

When not incarcerated, Mother worked with DCS to fulfill the department's permanency plan. Mother indicated that she took several classes and assessments as part of the plan and remained in contact with her DCS case worker. Mother has maintained housing since Jayda was born and during her periods of incarceration, though her family and friends have kept up with the rental payments for the property. However, Mother also failed the majority of the drug screens given to her during the same time period: Mother failed multiple drug screens through at least March 2018 and stated that she continued to use cocaine through at least April 2018. Mother visited Jayda nine times when she was not incarcerated, but missed multiple additional visitation appointments. Mother conceded that she had no meaningful relationship with her daughter, particularly while she was in custody. A DCS worker stated that Mother passed approximately two drug tests that the department administered when she visited Jayda.[4] Further, the child's siblings have had limited interactions with the child since her birth. Since Mother was incarcerated in 2018, she participated in multiple classes regarding literacy, empowerment, and mental and emotional "transformation." With the help of others, Mother believes she can obtain a job upon her release.

On April 19, 2018, DCS filed a petition to terminate Mother's parental rights to the child in the Hamilton County Circuit Court ("the trial court"). As initial grounds for termination, DCS alleged that Mother had abandoned the child through wanton disregard, failed to substantially comply with a permanency plan, and failed to address persistent conditions that led to the loss of custody. Further, DCS asserted that termination of parental rights was in the child's best interest. While incarcerated, Mother filed a two-page, handwritten response challenging the petition to terminate. DCS initially moved for the court to grant a default judgment and requested a guardian ad litem be appointed on June 29, 2018. DCS later withdrew the motion for default judgment and requested that the trial court appoint counsel for Mother. Counsel for Mother was appointed on July 20, 2018, and the matter was set for trial.

The trial occurred on September 28, 2018. At trial, DCS withdrew its claim that Mother did not substantially comply with the permanency plan. Mother testified about her criminal record, the death of the child's father, her history with drug abuse, her visits with the child, and the steps she has taken in and out of incarceration to rehabilitate herself. A DCS case worker testified that she served as the child's social worker since the child's entrance into foster care, and that DCS and Mother developed a permanency plan later ratified by the juvenile court. While Mother maintained housing, the case worker testified that Mother could not financially support herself when out of custody and failed

---

[3] Mother's incarceration status when this opinion was published was unclear.
[4] The testimony is not specific as to the dates where Mother passed drug screens.

- 3 -

to follow the recommendations that resulted from her mental health and drug and alcohol assessments.

The child's foster mother ("Foster Mother") testified that the child met developmental goals and bonded with her foster family. According to Foster Mother, a change in caretakers would be devastating to the child. DCS agreed that the child's current living situation was stable and loving, and said that her foster wanted to adopt her if possible.

Mother's pastor and friend testified in support of Mother, saying that she was a good parent to all of her children and had made positive changes in the months since the child was born.[5] Mother's pastor and friend spent limited time with Mother since the birth of the child at issue in this appeal. Mother's friend stated that she would assist Mother in finding work and offer support when she was released from incarceration.

At the conclusion of proof, the trial court orally ruled that DCS established that Mother had been incarcerated for all or part of the four months before the petition to terminate parental rights was filed. Further, the trial court found that DCS had proven by clear and convincing evidence that Mother exhibited wanton disregard for the child through her substance abuse and repeated incarceration during and after Mother's pregnancy. However, the trial court ruled in favor of Mother regarding the persistent conditions claim.

Finally, the trial court found by clear and convincing evidence that termination of Mother's parental rights would be in the best interests of the child. In analyzing the best interest factors, the trial court found that Mother had failed to make necessary changes to her conduct and lifestyle for the child to be safe at home or for lasting change to appear possible. Further, the trial court found that Mother had not regularly visited the child, that no meaningful relationship existed between Mother and the child, and that a transfer of custody would be detrimental to the child. Additionally, the trial court found that Mother's history with drug abuse and her mental and emotional state could make her unable to effectively parent the child. Consequently, the trial court granted DCS's petition to terminate Mother's parental rights. A written order to that effect was entered on January 30, 2019. Mother filed a timely notice of appeal.

### ISSUES PRESENTED

Each party presented different issues on appeal. As this Court perceives them, the issues presented by Mother's appeal are:

---

[5] Mother's pastor is the temporary custodian of one of Mother's children. The pastor testified that he received custody of the child to prevent him from being placed into foster care. He said he had not observed any interactions between Mother and Jayda since the child's birth.

1.      Whether the trial court erred in finding that DCS presented clear and convincing evidence to establish a statutory ground for termination of Mother's parental rights.
2.      Whether the trial court erred in finding that terminating Mother's parental rights was in the best interests of the child.

### STANDARD OF REVIEW

The Tennessee Supreme Court has previously explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear

- 5 -

and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## DISCUSSION

### Ground for Termination

The trial court found a single ground to support termination of Mother's parental rights—abandonment by wanton disregard for the child pursuant to Tennessee Code Annotated section 36-1-113(g)(1) (making abandonment a ground for termination of

parental rights).[6] At the time of the institution of this action, abandonment was defined as, *inter alia,*

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2017).[7] "[I]ncarceration is not an infallible predictor of parental unfitness." ***In re Audrey S.***, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Incarceration alone, therefore, cannot constitute grounds to terminate parental rights. ***Id.*** Rather, "[a]n incarcerated or recently incarcerated parent can be found [to have committed] abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." ***Id.*** Therefore, a parent's incarceration acts as a "triggering mechanism" that allows the court to examine more closely the child's situation "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." ***Id.*** As such, many cases have held that a "parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child." ***In re Navada N.***, 498 S.W.3d at 602; *see, e.g.,* ***State of Tenn., Dep't of Children's Services v. Hood***, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) ("Moreover, we have held that a parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children."); ***In re S.L.A.***, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse."); ***In re Audrey S.***, 182 S.W.3d at 867−68 (holding that wanton disregard may be established through

---

[6] While Mother does not specifically appeal the ground for termination, we are required to evaluate the findings for each ground of termination from the trial court, whether the ground was challenged on appeal or not. ***In re Carrington H.***, 483 S.W.3d at 525-26. The ***Carrington*** rule does not extend to grounds that were not sustained by the trial court and not challenged on appeal. ***In re Sydney B.***, 537 S.W.3d 452, 456 n.8 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Aug. 1, 2017). As such, this Court is not required to consider the trial court's ruling in Mother's favor regarding persistent conditions.

[7] Effective July 1, 2018, section 36-1-102(1)(A)(iv) was amended to remove the term willfully from this definition of abandonment. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856) ("Section 36-1-102(1), is amended by deleting the words 'willful' and 'willfully' wherever they appear[.]"). The amended version is not applicable in this case, nor is it relevant as the abandonment alleged in this case is based on Mother's alleged "wanton disregard" for the child.

evidence of "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child").

The circumstances for wanton disregard are not limited to a particular four-month period before the petition was filed. *In re Audrey S.*, 182 S.W.3d at 865. Parental conduct before a child's birth can establish wanton disregard if the parent knows the child exists *in utero*. *See **In re Savanna I.***, No. E2018-00392-COA-R3-PT, 2018 WL 6167386 at *13 (Tenn. Ct. App. Nov. 26, 2018); ***In re Anthony R.***, No. M2014-01753-COA-R3-PT, 2015 WL 3611244 at *3 (Tenn. Ct. App. June 9, 2015). Also, wanton disregard can be established when a child is knowingly exposed to drugs during pregnancy. *See **In re C.T.S.***, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004) (use of crack cocaine "clearly exhibits a wanton disregard for the welfare of the child"); ***State of Tenn., Dep't of Children's Services v. Harville***, No. E2008-00475-COA-E3-PT, 2009 WL 961782, at *8 (Tenn. Ct. App. Apr. 9, 2009).

To begin, we first consider whether Mother was incarcerated at the time the termination petition was filed or within the four months preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). A parent's incarceration does not need to be continuous during the four-month period. ***In re Audrey S.***, 182 S.W.3d at 871. In the present case, no dispute exists that Mother was incarcerated at various points during the four months before the termination petition was filed on April 19, 2018. Mother herself testified that she was released from custody on February 1, 2018, but was incarcerated again in March and April of that year. As such, this ground is clearly applicable.

Further, the trial court found clear and convincing evidence that Mother acted with wanton disregard in the care of her child. We agree with the trial court's assessment. Mother admitted to using cocaine while pregnant with Jayda and failed two drug screens in the weeks leading up to the child's birth, despite admitting that she was aware of her pregnancy. While the child did not have cocaine in her system when she was born, Mother tested positive for cocaine at the hospital. Between the birth of the child and the filing of the termination petition, Mother was in and out of jail on various charges, some of which related to her ongoing drug use. Although Mother was advised about the criteria that could lead to a termination of parental rights and allowed to participate in mental health court, Mother failed multiple drug screens and returned to custody for violating the terms of her probation during this period. Mother admits in her brief that she was incarcerated fourteen of the seventeen months of "this custodial episode." While Mother characterizes this time frame as merely an "episode," it constitutes the vast majority of her daughter's life. Mother's drug use, probation violations, and resulting inability to supervise the child constitute clear and convincing evidence of abandonment through wanton disregard. The trial court, therefore, did not err in finding that Mother's rights could be terminated by abandonment through wanton disregard.

**Best Interests of the Child**

After determining that a ground for termination was proven by clear and convincing evidence, we must further consider whether the trial court correctly determined that termination of Mother's parental rights was in the best interests of the child. Upon establishment of a ground for termination, "the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d at 877. The best interests of the child may not always lead to termination, even if a parent is deemed unfit by a court. *Id.*

To determine whether termination of parental rights is in a child's best interest's the court shall consider, but is not limited to, the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

Further, the Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Determining the best interests of a child does not simply involve examining statutory factors or counting how many factors support or oppose a potential termination. *Id.* at 682. Each analysis must remain "factually intensive", and consideration of the factors should be rooted in each case's unique facts and circumstances. *Id.* Courts must examine each statutory factor, along with any additional proof that is relevant and presented by the parties. *Id.*

In the present case, the trial court found that termination of Mother's parental rights was in the best interests of the child. We agree. At the time of the trial, Mother did not adequately adjust her conduct or circumstances to create a safe environment where it was in the child's best interests to return to her. Tenn. Code Ann. § 36-1-113(i)(1). Despite efforts from DCS, Mother failed to affect a lasting adjustment for a sufficient period of time to indicate that her lifestyle would change. Tenn. Code Ann. § 36-1-113(i)(2). We agree that Mother made substantial effort to comply with certain requirements of her permanency plan, by completing various assessments and classes. The record does not show, however, that completion of these classes has resulted in any

lasting changes on Mother's circumstances. Here, Mother admitted that she used illegal drugs as late as April 2018, approximately one year following the removal of Jayda. Moreover, Mother's other children had previously been removed from her custody. While Mother did pass two drug screens, the record is unclear on what date these drug screens occurred. Mother's claimed sobriety at trial is questionable where Mother was incarcerated at that time. Mother's brief makes much of the fact that she can provide a safe and secure home "in the near future" following her release from her latest incarceration. Overall, however, these facts do not provide this Court confidence that Mother has presently made a lasting adjustment of circumstances so as to make a safe and stable home for the child at this time. As such, these factors weigh in favor of termination.

Additional factors outlined in Tennessee Code Annotated section 36-1-113(i) also show that termination of parental rights is in the child's best interest. Even when Mother was not incarcerated, she missed multiple opportunities to visit with the child. *See* Tenn. Code Ann. § 36-1-113(i)(3). At trial, Mother admitted that she had no meaningful relationship with Jayda. *See* Tenn. Code Ann. § 36-1-113(i)(4). "This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]" *In re Addalyne S.*, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. 2018). Foster Mother testified largely without dispute that a change in caretakers would cause a detrimental effect on Jayda, as her foster family is the only one she has ever known. *See* Tenn. Code Ann. § 36-1-113(i)(5). Mother's history of drug abuse, both during and after her pregnancy with Jayda, indicates an environment that could be abusive to the child and could create an unsafe and unstable home for her. *See* Tenn. Code Ann. § 36-1-113(i)(6)–(7). While Mother has worked to improve her mental and emotional health while incarcerated, it was unclear at trial whether those improvements would be lasting when she is no longer in a controlled environment. *See* Tenn. Code Ann. § 36-1-113(i)(8). Mother paid no support for Jayda throughout her life, although Mother's failure to pay apparently results from her multiple incarcerations. *See* Tenn. Code Ann. § 36-1-113(i)(9). On balance, consideration of these factors indicates that the best interests of the child would be served by terminating the parental rights of Mother. The trial court did not err by finding that termination served Jayda's best interests by clear and convincing evidence.

Separately, Mother calls for this Court to consider the effects of "maintaining the child's relationship with her biological siblings" as part of our best interests reasoning. In her brief, Mother claims that the trial court entirely fails to consider the value of sibling relationships in determining the best interests of the child.[8] While maintaining sibling

---

[8] Mother failed to cite specific caselaw, statutes, or secondary sources in support of this argument. This argument was not presented at trial and not outlined until the Mother filed her appellate brief with this Court. While issues raised for the first time on appeal are typically waived, *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005), we will address this issue as part and parcel of the best interest analysis

- 11 -

relationships is not expressly listed as a factor to weigh when determining the best interests of a child, courts are not limited to considering the factors provided by statute. Tenn. Code Ann. § 36-1-113(i) ("In determining whether termination of parental or guardianship rights is in the best interest of the child… this court shall consider, *but is not limited to*, the following. . . .") (emphasis added). The trial court did not expressly consider these circumstances in its ruling but had the ability to evaluate them in light of the statutory factors. Further, we have previously held that the potential loss of sibling relationships does not outweigh the absence of the other enumerated factors listed in the statute. *See **State of Tenn., Dep't of Children's Services v. Estes***, 284 S.W.3d 790, 803−04 (Tenn. Ct. App. 2008), *overruled on separate grounds by **In re Kaliyah S.***, 455 S.W.3d 533 (Tenn. 2015). In ***Estes***, a mother's lack of employment, income, criminal history, and inability to make lasting adjustments in the best interests of the child outweighed the "effect of further removing the children from their siblings, as to whom [m]other has retained her parental rights, even if they are in the care of family members." ***Id.*** at 803−04. Similar circumstances exist in the present case. At the time of the trial, the siblings occasionally interacted with each other and had limited visits with Jayda. While a termination of parental rights may affect Jayda's relationships with her siblings, those siblings were not in Mother's care at the time of the trial. Even if Mother eventually regained custody of Jayda, there is no guarantee that she would also regain custody of her remaining children. While the trial court did not consider the child's relationships with her siblings in its analysis, those relationships and the likelihood that Mother is in the best position to maintain them would not outweigh the other factors that clearly favor termination in the present case. Even considering the potential loss of the sibling relationship, the present facts still support the trial court's finding that the termination of Mother's parental rights is in Jayda's best interests. As such, the trial court did not err in concluding that DCS presented clear and convincing evidence to show that the child's best interest is furthered by termination of Mother's parental rights.

### CONCLUSION

The judgment of the Hamilton County Circuit Court is affirmed, and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Denisha S., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

required to be conducted under the holding in ***Carrington***. *See* 483 S.W.3d at 525−26.